782 So.2d 426 (2001)
Thomas MILLER, Appellant,
v.
STATE of Florida, Appellee.
No. 2D97-2845.
District Court of Appeal of Florida, Second District.
February 28, 2001.
Rehearing Denied March 30, 2001.
*427 Randall O. Reder and Joe Episcopo, Tampa, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Scott A. Browne, Assistant Attorney General, Tampa, for Appellee.
DAVIS, Judge.
Thomas Miller appeals his conviction and sentence for three counts of manslaughter *428 and one count of grand theft. Miller argues that the trial court erred in failing to grant a judgment of acquittal as to the manslaughter charges and in failing to sever the grand theft charge from the manslaughter charges. He further alleges that the prosecutor's remarks in closing argument, while not objected to, constitute fundamental error. While we are not persuaded by the first two arguments, following a thorough review of the record, we conclude that, given this extremely close case, the prosecutor's remarks in closing argument rise to the level of fundamental error. Accordingly, we reverse the manslaughter convictions and remand for a new trial.

FACTUAL BACKGROUND
On Tuesday, February 7, 1996, at approximately 11:55 p.m., Kevin Farr was driving his white Camaro south on Keyesville Road in Hillsborough County. Brian Hernandez was riding in the front passenger seat, and Randall White was sitting in the back seat. As the Camaro entered the intersection of Keyesville Road and Lithia/Pinecrest Road, the car was struck by a tractor trailer traveling west on Lithia/Pinecrest Road. The impact killed all three occupants of the Camaro. Later that night, investigators found the stop sign that controlled the traffic at that intersection lying on the ground near the site of the accident.
Immediately after the accident, investigative efforts discovered that local young people were rumored to have been involved in stealing several area traffic signs. As a result, investigators contacted the appellant, Thomas Miller, and his friends, Chris Cole and Nissa Baillie. During the investigation, all three admitted stealing numerous other traffic signs from the surrounding area. A number of these signs were recovered from a nearby river where they had been discarded after the accident.[1] However, all three defendants consistently denied having anything to do with the stop sign at the site of the accident. The State filed a four-count information against each of them, charging three counts of manslaughter by culpable negligence and one count of grand theft.
Prior to trial, Miller and his co-defendants moved to sever the grand theft charge from the manslaughter charges. The trial court denied the severance. At trial, each of the defendants moved for a judgment of acquittal, arguing that the State failed to present sufficient circumstantial evidence to support the manslaughter charges. The trial court denied these motions. The jury found all three defendants guilty as charged. Miller and each of his co-defendants moved for new trials based on the insufficiency of the evidence and the inappropriate nature of the prosecutor's closing argument. The trial court denied these motions and sentenced each of them to thirty years' incarceration, suspended after fifteen years.

MOTION TO SEVER
Prior to trial, Miller moved to sever the grand theft charge from the manslaughter charges. He argued that there was no evidence linking the taking of the other signs to the downed stop sign at the site of the accident. Counsel for a co-defendant argued that evidence of the thefts should only be admitted if the State could show that it was proper Williams rule evidence.[2]
*429 The State countered that the grand theft count included the attempted taking of the stop sign in question.[3] Accordingly, the State argued that the theft of that sign and the accident were so intertwined that the charges should be tried together. The State argued further that the evidence of the thefts of the other signs provided evidence of the theft of the sign in question, so severance was inappropriate.
The amended information does not specify what signs were included in the grand theft charge, only that the total value of the signs exceeded $300. There was no bill of particulars or any other pleading that specified which signs were incorporated in the theft count. However, since none of the defendants challenged the State's representation that the subject sign was included, we cannot say that the trial court abused its discretion in denying the motion to sever, and affirm on this issue.

FAILURE TO GRANT JUDGMENT OF ACQUITTAL
Miller next argues that the trial court erred by not granting his motion for a judgment of acquittal after the State presented its case. He suggests that the circumstantial evidence presented by the State was not sufficient to exclude every reasonable hypothesis of innocence and that the evidence did not establish that the removal of the sign was the proximate cause of the accident. We disagree with both of Miller's contentions.
We first observe that the trial court should not grant a motion for judgment of acquittal "unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." Lynch v. State, 293 So.2d 44, 45 (Fla.1974). Moreover, where, as here, the State's evidence is purely circumstantial, the conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. See State v. Law, 559 So.2d 187 (Fla.1989). However, because the issue of whether the evidence fails to exclude all reasonable hypotheses of innocence is a question for the jury, we will not reverse where there is competent, substantial evidence to support the jury verdict. Id. at 188. We conclude that there is competent, substantial evidence to support the verdict here.
While there was no direct evidence linking Miller and his co-defendants with the subject sign, during the investigation, Miller and each of his co-defendants admitted to sheriffs deputies that they had stolen the other signs. Although each adamantly denied any involvement with the subject sign, the State presented a scenario in which the three defendants rode around the area in Cole's pickup truck stealing various signs. Moreover, although some of the details were contested, the jury heard evidence that the co-defendants took some signs that were still attached to their posts, removed some signs from their posts at the side of the road, and on occasion, left a sign on the ground beside the road if their attempt to remove it from its post was interrupted by an approaching vehicle. In such cases, they would go back later to retrieve the sign. The evidence further showed that the signs the co-defendants admitted taking were all located within a five-mile radius of the location of the accident. The stop sign in question was found lying on the ground with the top bolt missing. Finally, a warning sign located one-tenth of a mile north of the intersection on Keyesville Road (that is, approaching the intersection) was found with one bolt missing and *430 the other bolt partially unscrewed. The State argued that these facts, together with several statements made by the defendants that could be understood to be inculpatory, sufficiently formed a welllinked chain of circumstances from which the jury could reasonably infer that the defendants attempted to take the subject sign as part of their sign-stealing spree, but abandoned the effort, leaving it on the ground near the intersection. Thus, argued the State, Miller and his co-defendants were responsible for the victims' deaths.
Miller challenges the sufficiency of this evidence, arguing that there is no evidence to connect the timing of the taking of the other signs with the attempted taking of the subject sign. Miller and his co-defendants consistently stated that they took all the signs on one evening, a Friday, and that it was either the last Friday of January or the first Friday in February.[4] Furthermore, one of the State's witnesses said that he saw the signs that the co-defendants took at the defendants' home "a couple of days" before the accident.[5] Therefore, the signs had already been taken as of February 4 or 5. However, Miller pointed out, the testimony established that the subject sign was still up on Monday, February 6, but was down on Tuesday, February 7, the day of the accident. Miller argued that based on this evidence, the only reasonable inference that could be drawn is that the co-defendants took the other signs at least several days before the accident occurred, but the subject sign was taken down on the evening of Monday, February 6, 1996. Consequently, there was insufficient evidence to connect the stealing of the other signs to the attempted taking of the subject sign.
However, the State presented contradictory testimony on the issue of timing from Larry (Jaimie) Jarrard, a friend of Cole's. Jarrard testified that he talked with Cole and Baillie about the signs the day after the accident. When asked whether the defendants told him when they took the signs, he responded, "I believe they said the day before." This testimony, if accepted by the jury, notwithstanding the other testimony to the contrary, provided the required competent, substantial evidence to tie the circumstances of the other thefts to the subject sign. Accordingly, we conclude that, even though the sufficiency depends on Jarrard's rather equivocal testimony, the record supports the trial judge's discretionary denial of the motion for a judgment of acquittal.
We hasten to add, however, that when the trial court properly denied the motion for a judgment of acquittal, the evidence before the jury had not yet been tainted by the prosecutor's closing remarks, the effect of which poisoned the resulting verdict. Thus, in the absence of the prosecutorial taint, the evidence before the jury provided the competent, substantial evidence required to avoid a judgment of acquittal.
Although Miller also argues that other factors may have been the proximate cause of the accident, the issue of proximate cause is a jury question, and the trial court was correct to deny the motion for a judgment of acquittal on this ground. See Cho v. Mackey, 567 So.2d 1064 (Fla. 2d DCA 1990).

*431 PROSECUTOR'S CLOSING ARGUMENT

Finally, Miller argues that the prosecutor's closing argument included several errors and instances of misconduct. For example, the prosecutor referred to three defense witnesses who worked for a local construction company as the "Larry, Daryl, and Daryl of BMW Construction," a reference to three slow-witted television characters. Although it is improper to personally degrade a witness, no objection was made and such a comment does not rise to the level of fundamental error. See Martin v. State, 68 Fla. 18, 66 So. 139 (Fla.1914). Likewise, it was improper for the assistant state attorney to accuse another defense witness of being a "glory hound" because "he sure was dressed up nice." Again, no objection was made, and the comment was not fundamental error.
However, two prosecutorial errors do cause great concern. The first requires some background explanation. During direct examination, the prosecutor asked the investigating officer if he had any training in determining by a person's body language whether the individual was being truthful or deceitful. Over the objection of a defendant, the officer explained how one could distinguish truth from falsehood by watching the movement of the speaker's eyes. Although Deputy Bradish was not presented by the State as an expert, the court allowed this testimony as part of the officer's "qualifications." In closing argument, the prosecutor improperly used this testimony to imply that the officer had provided expert testimony on the topic of body language. She said:
You will be able to look at that video. You will be able to look at the eyes of each of these three individuals when they spoke to Lloyd Sours. You heard deputy Bradish tell you he has had specific training in body language regarding interrogation techniques. You look at where Thomas Miller's eyes go. Stop the video and look at it. Where do his eyes go when he's asked about his knowledge of that sign.
This argument was improper. The officer had not been qualified by the trial court as an expert, and lay witnesses may not normally testify in terms of inferences or opinions. See Floyd v. State, 569 So.2d 1225 (Fla.1990). In closing, not only did the prosecutor imply that the deputy's testimony amounted to expert testimony, she advised the jury to apply the officer's "expertise" in evaluating Miller's credibility.
The second prosecutorial error occurred when the prosecutor mischaracterized the testimony of Larry (Jaimie) Jarrard concerning the issue of when the signs were taken. During the trial, when asked if the co-defendants had told him when the signs were taken, Jarrard answered, "I believe they said the day before." In her initial closing argument, the prosecutor used this testimony to support her argument that the signs were all taken the night before the accident. However, her characterization of Jarrard's testimony was erroneous. She told the jury: "But Jaimie Jarrard even told you Nissa Baillie told me, I'm relatively certain, that they took these signs the night before the crash." After the State's initial closing argument, Nissa Baillie's attorney argued that the evidence did not connect the taking of the other signs with the subject sign because the evidence showed the other signs were taken on a Friday before the accident, and the sign at the site of the accident was downed on the Monday night before the accident. In her closing rebuttal, the prosecutor again said: "Well, Jaimie Jarrard, who is a friend of these people, said that he is relatively certain that they had taken the signs the night before the crash." In other words, the prosecutor twice told the *432 jury that Jarrard was "relatively certain" that the defendants had taken the signs the night before the accident even though Jarrard's actual testimony was less conclusive.
The State argues that since neither Miller nor either of the other defendants objected to these errors during the closing argument itself, these alleged errors have not been preserved. Accordingly, the question before this court is whether these errors are to be considered fundamental.
The test for determining fundamental error is whether the error "goes to the foundation of the case or goes to the merits of the cause of action." Ashford v. State, 274 So.2d 517, 518 (Fla.1973) (citing Sanford v. Rubin, 237 So.2d 134, 137 (Fla. 1970)). Specifically, prosecutorial misconduct constitutes fundamental error when, but for the misconduct, the jury could not have reached the verdict it did. See Kilgore v. State, 688 So.2d 895, 898 (Fla.1996); Cochran v. State, 711 So.2d 1159 (Fla. 4th DCA 1998). This test was explained by the Florida Supreme Court in Brown v. State, 124 So.2d 481, 484 (Fla.1960):
For example, where the State relied entirely upon a confession to obtain a first degree murder conviction it was fundamental error for the trial judge to fail to advise the jury on the weight to be given a confession even though no such charge was requested. Harrison v. State, 149 Fla. 365, 5 So.2d 703. Similarly, in one of the leading cases on this subject, Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, the Supreme Court of the United States concluded that a murder conviction was fundamentally erroneous when the state relied entirely on a confession and the trial judge had failed to ascertain its voluntary character. In both of these cases there was no other evidence which would have supported the conviction.
Fundamental error also has been described as error that destroys "the essential fairness of a criminal trial." See Dukes v. State, 356 So.2d 873, 874 (Fla. 4th DCA 1978).
Because there is an absence of any direct evidence connecting Miller and his co-defendants with the sign in question, each link in the chain of circumstances presented in the State's case is essential. This is especially true of the evidence as to when the other signs were taken.
To return a verdict of guilty on the manslaughter charges, the jury must have accepted Jarrard's testimony on the timing issue and rejected the other witnesses' testimony. Had the jurors discarded Jarrard's testimony as inconclusive, the only remaining evidence of timing was the co-defendants' testimony that the signs were taken on a Friday night, days before the accident, testimony that was corroborated by the State's own witness. Accordingly, the misquoting of Jarrard's testimony became significant. Additionally, and perhaps more importantly, the prosecutor's suggestion that the deputy's body language testimony was an expert standard that the jurors should apply when they viewed the video tapes of the defendants most certainly tainted the jury's evaluation of Miller's credibility.
We therefore conclude that the cumulative impact of these errors was fundamental. In her closing argument, the prosecutor impermissibly boosted the strength and credibility of Jarrard's testimony, while, at the same time, impermissibly and severely damaging the credibility of Miller. Without accepting this one piece of evidence, the jury could not have returned a verdict of guilty. To conclude that the other signs were taken on one night and the subject stop sign was taken on a separate occasion is speculation and not a reasonable *433 inference that can be drawn from the evidence presented given the fact that there was no evidence that the signs were taken on two separate occasions or that any other signs were taken. Miller is entitled to have a jury weigh this conflicting evidence without the taint of the prosecutor's erroneous argument.
As was the case in Cochran, "[t]aken individually, in a different case, the prosecutor's comments may not have been so egregious as to warrant reversal." 711 So.2d at 1163. However, when the comments are viewed cumulatively, in the context of this extremely close case, we conclude that the errors did go "to the foundation of the case" and thus amounted to fundamental error, requiring us to reverse the manslaughter convictions for a new trial.
Reversed in part and remanded for a new trial.
SALCINES, J., concurs.
BLUE, A.C.J., concurs in part; dissents in part with opinion.
BLUE, Acting Chief Judge, concurring in part; dissenting in part.
I concur in much of the majority's well-written opinion and, in particular, the decision to reverse based on the State's argument, but I conclude the trial court erred when denying the motion for judgment of acquittal. Thus, I respectfully dissent.
The loss of three young lives cries out for atonement, and the defendants' admission to removing street signs in the area makes them prime suspects for the removal of the stop sign critical to this case. While I may share the suspicion, our justice system requires much more than suspicion to sustain a criminal conviction. There must be proof beyond a reasonable doubt and where, as in this case, the evidence of guilt is circumstantial, the State carries a burden of producing evidence that is inconsistent with any reasonable hypothesis of innocence. The defendants' position, that they were guilty of the theft of some road signs but had not removed the stop sign at the intersection of Keyesville Road and Lithia Pinecrest Road, must be overcome by evidence from the State.
In my opinion, the failure of the State's case results from an inability to connect in time the removal of the stop sign, which caused this tragic accident, to those signs admittedly stolen by the defendants. The State's case is replete with evidence that the defendants were in possession of the stolen signs several days before February 7, 1996. The State's evidence also established that the stop sign in question was removed no earlier than the day before the accident.
The only evidence to connect the removal of the critical stop sign and the theft of the other road signs came from the statement quoted in the majority opinion: "I believe they said the day before." (Emphasis supplied.) The State clearly recognized the weakness of this testimony, as evidenced by the misleading characterization of the statement in final argument. The jury was told that the witness was "relatively certain," when, in fact, his testimony lacked any certainty.
I would conclude that the trial court erred in failing to grant the motion for judgment of acquittal. The State "must produce substantial, competent evidence from which the jury can exclude every reasonable hypothesis of innocence except that of guilt. Otherwise, a trial court must grant a motion for judgment of acquittal...." Green v. State, 667 So.2d 208, 212 (Fla. 2d DCA 1995) (citing State v. Law, 559 So.2d 187, 188-89 (Fla.1989)). I cannot accept that this one vague and ambiguous statement constituted substantial, competent *434 evidence sufficient to overcome the defendants' reasonable hypothesis of innocence. Although I can agree that the circumstantial evidence painted a suspicious factual scenario regarding their possible involvement, we are required "to apply a special standard of review when analyzing the sufficiency of the evidence to sustain a conviction based wholly on circumstantial evidence." Green, 667 So.2d at 212 (citing Jaramillo v. State, 417 So.2d 257 (Fla. 1982)). Therefore, I respectfully dissent from the affirmance of the trial court's denial of the motion for judgment of acquittal.
NOTES
[1] At trial, the State introduced twenty-one traffic signs recovered from the river and from the appellants' residence. Of these, only one was a stop sign.
[2] Williams v. State, 110 So.2d 654 (Fla.1959).
[3] "A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or use, the property of another." § 812.014, Florida Statutes (1995).
[4] The defendants were questioned as to this issue on February 17. They said they took the signs on a Friday about two to three weeks prior to the date of the interview.
[5] Miller and his two co-defendants shared a mobile home.